**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) ) ) ) | No. 2:18-mn-2873-RMG<br><br>**This Document Relates to:**<br>No. 2:20-cv-04263-RMG<br>No. 2:19-cv-03288-RMG<br>No. 2:19-cv-03290-RMG<br>No. 2:20-cv-04191-RMG<br>No. 2:20-cv-02115-RMG |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
THE UNITED STATES OF AMERICA'S SITE-SPECIFIC MOTION TO DISMISS
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1)**

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................. 1

FACTUAL BACKGROUND .................................................................................. 3

    CAFB Had Established, Mandatory Protocols for Responding to and Disposing of
    AFFF Releases from Hangar Suppression Systems ........................................... 4

    CAFB's Numerous Accidental AFFF Discharges Include Repeated Breaches of
    OI 32-11 that Allowed AFFF to Enter the Sanitary Sewer System and Contaminate
    the NPLO ......................................................................................................... 5

    In 2015, CAFB Began Investigating PFAS Releases and Their Potential Impact With
    Knowledge that Contaminants Could Flow from the Base to the Dairies ..................... 5

    The Dairy Plaintiffs' Properties Have Been Ruined by PFAS Contamination Resulting
    from CAFB's Inability to Properly Contain and Dispose of AFFF Releases ................ 6

    The PFAS Cleanup at Cannon is Governed by the NMHWA and Overseen by New
    Mexico.............................................................................................................. 8

ARGUMENT ......................................................................................................... 9

    I.   This Court Has Subject-Matter Jurisdiction Over the Dairy Plaintiffs' State-Law
        Tort Claims Regardless of Whether the DFE Applies ................................. 9

        A.  The Dairy Plaintiffs' Claims Each Allege Harm from Water Pollution and Are
            Therefore Subject to a Superseding Waiver of Immunity Under the CWA ........... 9

        B.  The Dairy Plaintiffs' Trespass Claims Are Subject to a Specialized Immunity
            Waiver Under the FTCA ................................................................... 10

    II.  The DFE Does Not Apply to the Dairy Plaintiffs' FTCA Claims ........................... 10

        A.  OI 32-11 Was a Mandatory Directive Prohibiting AFFF from Entering CAFB's
            Sanitary Sewer System .................................................................... 10

        B.  Violations of OI 32-11 Have Contributed to the Dairy Plaintiffs' Injuries .......... 14

        C.  The DFE Does Not Apply to the Government's Failure to Warn About Potential
            PFAS Contamination of the Dairy Plaintiffs' Properties and Water Supplier...... 15

   III. New Mexico's Claims Enforce State Hazardous Waste Laws and Are Not a
        Challenge under § 113(h) .................................................................... 17

        A.  The Air Force Is Not Excused from Its RCRA Permit Obligations .................... 17

        B.  Enforcement of the NMHWA Does Not Constitute a Challenge ........................ 18

## **TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Anacostia Riverkeeper v. Washington Gas Light Co.*,
   892 F. Supp. 2d 161 (D.D.C. 2012) ............................................................. 19

*Anthony v. United States*,
   632 F. Supp. 3d 1017 (D. Ariz. 2022) ......................................................... 11

*Ark. Peace Ctr. v. Ark. Dept. of Pollution Control and Ecology*,
   999 F.2d 1212 (8th Cir. 1993) .................................................................... 20

*Broward Gardens Tenants Ass'n v. EPA*,
   311 F.3d 1066 (11th Cir. 2002) .................................................................. 19

*Cannon v. Gates*,
   538 F.3d 1328 (10th Cir. 2008) .................................................................. 19

*El Paso Natural Gas Co. v. U.S.*,
   750 F.3d 863 (D.C. Cir. 2014) ................................................................... 20

*In re Korean Air Lines Disaster of Sept. 1, 1983*,
   829 F.2d 1171 (D.C. Cir. 1987) ................................................................. 19

*N.C. ex rel. Cooper v. TVA*,
   515 F.3d 344 (4th Cir. 2008) ....................................................................... 9

*Parrish v. United States*,
   157 F. Supp. 3d 434 (E.D.N.C. 2016) ....................................................... 16

*Priah v. United States*,
   590 F. Supp. 2d 920 (N.D. Ohio 2008) ...................................................... 14

*R.E. Goodson Const. Co. v. Int'l Paper Co.*,
   2005 WL 2614927 (D.S.C. Oct. 13, 2005) ................................................ 19

*Razore v. Tulalip Tribes of Washington*,
   66 F.3d 236 (9th Cir. 1995) ....................................................................... 19

*Reynolds v. Lujan*,
   785 F. Supp. 152 (D.N.M. 1992) ............................................................... 19

*Reynolds v. United States*,
   2015 U.S. Dist. LEXIS 184062 (D.S.C. Aug. 14, 2015) ........................... 11

*Sanders v. United States*,
   937 F.3d 316 (4th Cir. 2019) ............................................................... 11, 14

*U.S. v. Colorado*,
   990 F.2d 1565 (10th Cir. 1993) ............................................................ 19, 20

*Washington v. Dep't of the Navy*,
446 F. Supp. 3d 20 (E.D.N.C. 2020) ................................................................. 16

*Ziglar v. Abbasi*,
137 S. Ct. 1843 (2017) ....................................................................................... 11

## Statutes

28 U.S.C. § 1346(b) ................................................................................................ 10

28 U.S.C. § 2680(a) .................................................................................................. 2

28 U.S.C. § 2680(h) ................................................................................................ 10

33 U.S.C. § 1323(a) .................................................................................................. 2

42 U.S.C. § 6926 .................................................................................................... 17

42 U.S.C. § 6926(d) ............................................................................................... 17

42 U.S.C. § 9613(h) .................................................................................................. 2

42 U.S.C. § 9620(a)(4) ........................................................................................... 20

42 U.S.C. § 9620(e) ............................................................................................... 20

42 U.S.C. § 9620(i) ................................................................................................ 20

## Other Authorities

50 Fed. Reg. 1515 (Jan. 11, 1985) ........................................................................... 8

60 Fed. Reg. 53708 (Oct. 17, 1995) ......................................................................... 8

62 Fed. Reg. 62523 (Nov. 24, 1997) ...................................................................... 20

81 Fed. Reg. 33250 (May 25, 2016) .......................................................................... 6

**INTRODUCTION**

This Court requested site-specific briefing to help it determine whether a "need for more discovery" exists at other contaminated sites[1] or if a "global resolution" of the Government's jurisdictional arguments is "appropriate" through omnibus motions practice. **Ex. 1** at 11:22–25. Pursuant to CMO 25, the PEC chose the site addressed in this Opposition, Cannon Air Force Base ("CAFB" or the "Base"), to demonstrate that each site has unique facts and circumstances that warrant separate treatment for purposes of jurisdictional discovery. The CAFB site implicates not only the private rights of its neighbors, but also the sovereign rights of Plaintiff State of New Mexico ("New Mexico").

CAFB is one of the most heavily contaminated sites in the country and was included in the "top 10 of prioritized active US Air Force installations" for addressing PFAS contamination. **Ex. 2** at 4842. Among those impacted are four nearby dairy farms,[2] whose properties and water supplies have been contaminated with PFAS as a result of CAFB's use of AFFF and its failure, *after* that use, to sufficiently contain the AFFF's environmental impact. The resulting PFAS contamination has not only infiltrated the neighboring Dairy Plaintiffs' drinking water wells, but also their homes, silage, and livestock, to the point of making their properties unusable. Beyond this deep invasion of the Dairy Plaintiff's rights in property and person, the Government has also interfered with New Mexico's EPA-delegated authority to enforce the Base's obligations under the New Mexico

---

[1] This refers to the sites other than CAFB that are listed in Appendix A to the Government's brief in support of its omnibus DFE motion. App. A, Gov't DFE Br., Dkt. 4548-2

[2] The four dairy farms are Plaintiffs Day Star Dairy, DoRene Dairy General Partnership, Highland Dairy, and Rajen Dairy (the "Dairies"). The term "Dairy Plaintiffs" shall collectively refer to the Dairies and the other individual plaintiffs from the Dairies that have sued the Government, who include Doug Handley, Irene Handley, Dustin Handley, Art Schaap, Renee Schaap, Todd Teune, Carolyn Teune, Sybrand R. Vander Dussen, Jenise Kay Vander Dussen, Sybrand J. Vander Dussen, Jonathan E. Vander Dussen, and Daniel W. Vander Dussen.

Hazardous Waste Act ("NMHWA") when investigating and cleaning up that contamination. *See* **Ex. 3** at pp. 2-5.

This Opposition will set out the factual basis for why the Government, in its capacity as the owner or lessee of land, cannot be permitted to escape responsibility on jurisdictional grounds when the conduct of its employees, on its land, pollutes or otherwise harms its neighbors. This principle flows from several independent legal sources: (1) under Section 1323(a) of the Clean Water Act, 33 U.S.C. § 1323(a), Congress has directed that, like any other landowner, the Government is subject to state tort liability when it causes water pollution; (2) an unbroken line of appellate precedent confirms that, as originally enacted in 1946, the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq.*, categorically waived immunity on common-law trespass claims like those asserted by the Dairy Plaintiffs; and (3) even if these categorical waivers did not exist, the Dairy Plaintiffs' claims arise from Government conduct that either violated a mandatory directive concerning operations on its land or that was not susceptible to the policy considerations needed to apply the discretionary function exception ("DFE"), 28 U.S.C. § 2680(a).

Moreover, inherent in that principle is the requirement that the Government conduct itself on its land in a manner that complies with its obligations under applicable laws, regulations, and/or permit requirements. This includes the obligations at the center of New Mexico's lawsuit, which is not a challenge to the Government's cleanup at CAFB under the Comprehensive Environmental Response, Compensation and Liability Act's ("CERCLA") timing of review provision ("§ 113(h)" or "Section 113(h)"), 42 U.S.C. § 9613(h), but simply an enforcement action to ensure the Government complies with the NMHWA.

Bearing in mind the purpose of this site-specific briefing, the Dairy Plaintiffs and New Mexico have provided proof of concept for how site-specific facts can impact the applicability of the DFE and § 113(h), underscoring the need for similar, focused discovery at the other sites.

## FACTUAL BACKGROUND

Introduced at CAFB in 1970, AFFF was widely used and often improperly disposed of at the Base for decades. During this time, CAFB repeatedly failed to adhere to its own mandatory operating instructions for managing AFFF, which led to a series of accidental discharges and spills where PFAS—the key ingredient in AFFF—was released into the environment. The consequences of these lapses became starkly apparent in 2018, when an investigation revealed that PFAS levels in CAFB's soil, surface water, and groundwater vastly exceeded EPA's safety thresholds, implicating the Base as a significant source of environmental contamination. This has had profound repercussions for local agriculture, particularly for neighboring dairy farms like the Dairies, where the financial and operational impact of the PFAS contamination has been felt most acutely. Facing costly remediation to salvage their businesses, the Dairy Plaintiffs each filed lawsuits asserting causes of action against the Government for (1) negligence, (2) failure to warn, (3) trespass, and (4) nuisance.[3]

---

[3] Compl. ¶¶ 218–230, 240–251, 272–295, *DoRene Dairy Gen. P'ship et al v. 3M Company*, No. 2:20-cv-04263-RMG (D.S.C. Dec. 9, 2020), Dkt. No. 1 ("DoRene Dairy Compl."); Compl. ¶¶ 94–166, *Schaap et al v. United States of America et al*, No. 2:19-cv-03288-RMG (D.S.C. Nov. 21, 2019), Dkt. No. 1 ("Highland Dairy Compl."); Compl. ¶¶ 96–168, *Teune et al v. United States of America et al*, No. 2:19-cv-03290-RMG (D.S.C. Nov. 21, 2019), Dkt. No. 1 ("Day Star Dairy Compl."); Compl. ¶¶ 223–235, 245–256; 268–300; *Vander Dussen et al v. 3M Company et al*, No. 2:20-cv-04191-RMG (Dec. 3, 2020 D.S.C.), Dkt. No. 1 ("Rajen Dairy Compl.").

Plaintiffs in the *DoRene Dairy* and *Rajen Dairy* cases have also asserted causes of action for inverse condemnation. DoRene Dairy Compl. ¶¶ 296–299; Rajen Dairy Compl. ¶¶ 301–304. Should the Court agree that the Court of Federal Claims has exclusive jurisdiction over such claims, *see* Gov't DFE Br. at 36 n.15, Plaintiffs are prepared to voluntarily dismiss them without prejudice and/or amend their respective complaints to remove them and any allegations made in support.

**CAFB Had Established, Mandatory Protocols for Responding to and Disposing of AFFF Releases from Hangar Suppression Systems**

In 1998, CAFB finished construction on a new treatment plant (the "WWTP") for wastewater generated at the Base. *See* **Ex. 4**, Aff. of James P. Bearzi ("Bearzi Aff."), Ex. H § 2.5.3. Once completed, the WWTP began discharging treated effluent to the North Playa Lake Outfall (the "NPLO"), an unlined playa lake located at the east-central edge of the Base. *Id.* §§ 2.5.3, 3.5.1; **Ex. 5** at 9578 (6/24/1998 letter from NMED to CAFB). On June 1, 2000, a permit EPA issued pursuant to the Clean Water Act's National Pollutant Discharge Elimination System (the "NPDES Permit") went into effect that imposed certain requirements on CAFB concerning the WWTP's operation and the quality of its effluent discharges to the NPLO. *See* Bearzi Aff., Ex. J ("Rebman Tr.") 55:5-10. Among them were a "duty to comply" with "all conditions of [the] permit" and that "no discharge" of treated effluent from the WWTP contain "visible foam in other than trace amounts." Bearzi Aff., Ex. L at 0764, 0775.

On June 1, 2002, CAFB adopted CE Operating Instruction 32-11 ("OI 32-11"). Bearzi Aff., Ex. N ("2002 OI 32-11"); Rebman Tr. 198:6-199:12. Drafted by John Rebman, Rebman Tr. 188:7-10, OI 32-11's stated purpose was to "establish policy and guidance associated with the release of AFFF" for "both military and civilian personnel" in the Environmental, Operations, Fire Protection, and Construction flights at CAFB. 2002 OI 32-11 § 1. OI 32-11 further advised that "[a]ll personnel" in those flights were "responsible directly to the flight commanders for the enforcement of this OI." *Id.* Most importantly, in a section of OI 32-11 titled "POLICY," the very first sentence read: "Generally,[4] AFFF ***must be kept out*** of storm drain inlets and the sanitary

---

[4] As used here, the term "generally" only modifies the portion of the policy pertaining to AFFF releases to CAFB's storm water drainage system—as opposed to its sanitary sewer system—since OI 32-11 acknowledges elsewhere that "non-storm water discharges" were "authorized" to enter "storm water drainage system," including "water associated with firefighting activities." 2002 OI

4

sewer system." *Id.* at § 5(a) (emphasis added). On February 1, 2014, CAFB adopted a new version of OI 32-11 that revised this portion of the "POLICY" section to state: "Generally, AFFF/HX foam should be kept out of storm drain inlets and ***must not enter*** the sanitary sewer system." Bearzi Aff., Ex. M ("2014 OI 32-11") § 5(a) (emphasis added).

**CAFB's Numerous Accidental AFFF Discharges Include Repeated Breaches of OI 32-11 that Allowed AFFF to Enter the Sanitary Sewer System and Contaminate the NPLO**

CAFB has experienced dozens of accidental PFAS discharges at various locations on the Base. In total, ***at least forty-five (45) separate accidental discharges of AFFF*** occurred at CAFB leading to the release of ***more than 4,500 gallons of AFFF*** across the Base. *See* Bearzi Aff., App'x A (summary of the accidental AFFF discharges that have occurred at CAFB documenting each incident). That includes AFFF releases in February 2004, January 2005, and September 2008 where Base personnel failed to comply with OI 32-11 by allowing the AFFF to enter CAFB's sanitary sewer system. *See* Rebman Tr. 227:9-228:5 (agreeing that the AFFF discharged in February 2003 "did reach the wastewater treatment plant"); Bearzi Aff., Ex. O (describing the accidental release of 715 gallons of AFFF in January 2005 that was "subsequently discharged into the sanitary sewer distribution system"); Rebman Tr. 258:1-259:11 (agreeing that the September 2008 discharge resulted in the release of AFFF into CAFB's sanitary sewer system).

**In 2015, CAFB Began Investigating PFAS Releases and Their Potential Impact With Knowledge that Contaminants Could Flow from the Base to the Dairies**

As early as 2015, the Air Force's outside consultant conducted a Preliminary Assessment that identified the areas at CAFB where AFFF was likely discharged into the environment, one of which was the NPLO. Bearzi Aff., Ex. B §§ 4.0–4.2. A Final Report for the Preliminary Assessment ("Final PA Report") was issued in October 2015 that acknowledged both the "general

---

32-11 § 4(b). Conversely, nothing in OI 32-11 suggests that similar discharges of "water associated with firefighting activities" were authorized for CAFB's sanitary sewer system.

direction of groundwater flow in the Cannon AFB area is from northwest to southeast" and a groundwater pathway "downgradient of North Playa Lake" that included land "used mainly for industrial and agricultural purposes." *Id.* at §§ 1.3.2, 3.4.2.3. The report further acknowledged that "wastewater collected at the WWTP containing PFCs would be passed on to North Playa Lake" and included an appendix summarizing CAFB's lengthy history of accidental AFFF releases into the environment, including multiple releases that entered the sanitary sewer system and made it to the WWTP. *Id.* at § 3.4.2.2, App'x C.

In May 2016, EPA issued Lifetime Health Advisories that set a 70 ppt advisory level (the "LHA level") for PFOA and PFOS in drinking water after concluding that exposure to the two PFAS "over certain levels may result in adverse health effects." 81 Fed. Reg. 33250 (May 25, 2016). EPA developed the advisories to "assist federal, state, tribal and local officials, and managers of drinking water systems in protecting public health when these chemicals are present in drinking water," *id.*, marking a key milestone in the agency's efforts to inform interested parties and the public-at-large about PFAS-related environmental and health concerns.

In 2017, another contractor initiated a Site Investigation, sampling those potential release areas and testing them for PFAS. Bearzi Aff., Ex. P § 3.0. It was not until August 24, 2018, that CAFB published the Final Site Inspection Report, which, among other findings, reported detections for PFOS and combined PFOA/PFOS in the NPLO's surface water that exceeded EPA's LHA level of 70 ppt. *Id.* at §§ 3.6.2–3.6.3.

**The Dairy Plaintiffs' Properties Have Been Ruined by PFAS Contamination Resulting from CAFB's Inability to Properly Contain and Dispose of AFFF Releases**

The PFAS contamination resulting from CAFB, much of it from the NPLO, has caused devastating and irreparable harm to the Dairy Plaintiffs' properties and businesses. By way of example, Highland Dairy is owned by Art Schaap, a third-generation dairy farmer, who founded

the dairy in 1992 on a 320-acre plot he purchased adjacent to CAFB. **Ex. 6**, Aff. of Arthur F. Schaap ("Schaap Aff.") ¶¶ 2-3. Schaap first learned that Highland was at risk of PFAS contamination from a letter he received from CAFB on August 24, 2018, Schaap Aff. ¶¶ 16–19 & Ex. B, the same day the Final Report from CAFB's Site Investigation ("Final SI Report") was released—a report that disclosed, among other findings, detections for PFOS and combined PFOA/PFOS in the NPLO's surface water that exceeded EPA's LHA level of 70 ppt. Bearzi Aff., Ex. P § 3.6.2. After receiving CAFB's letter, Schaap agreed to have Highland's water tested, which led to the Base informing him in September 2018 that combined PFOA/PFOS levels of 671 ppt and 1,649 ppt had been detected in his family's drinking water and the dairy's livestock water, respectively. Schaap Aff. ¶¶ 20–21 & Ex. C. More recent testing has revealed levels of total PFAS exceeding 41,000 ppt in Highland Dairy's livestock water. *Id.* ¶ 93.

Since detecting PFAS in its water, Highland Dairy has had its Grade A Dairy Permit revoked, *id.* ¶¶ 40–47 & Ex. J; its dairy cows excluded from the beef-processing market, *id.* ¶¶ 48–51 & Exs. K–L; its output contract with Dean's Foods terminated, *id.* ¶¶ 34–39 & Ex. H; its operating losses climb to $37 million while participating in a federal indemnity program,[5] *id.* ¶¶ 52–66; and more than 3,600 of its dairy cows euthanized due to PFAS poisoning. *Id.* ¶¶ 79–92. Absent the PFAS contamination, the property's fair market value would have been around $18 million, *id.* ¶¶ 93–101, and Highland Dairy would have remained a fully licensed, highly profitable

---

[5] In its brief, the Government highlights that Highland Dairy has already received compensation for PFAS-related losses through its participation in the same federal indemnity program. Gov't CAFB Br. at 5. But that amount does not even offset the $26 million in operating losses that Highland Dairy incurred while participating in that program. Schaap Aff. ¶ 65. That does not even consider the cost of remediating the soil at Highland Dairy, which has been estimated at well over $500,000 per acre. *Id.* ¶¶ 100. Thus, any suggestion that the Government might mean to convey that either Schaap or Highland Dairy have been made whole (or anything close to it) by the compensation Highland has already received is without basis.

diary. Instead, that property and business are now worth nothing. *Id.*

**The PFAS Cleanup at Cannon is Governed by the NMHWA and Overseen by New Mexico**

The NMHWA governs the PFAS cleanup at CAFB. **Ex. 7**, Aff. of Frederic Shean ("Shean Aff.") ¶¶ 23–24, 27. EPA has authorized New Mexico to administer the NMHWA in lieu of the Resource Conservation and Recovery Act ("RCRA"), including its Corrective Action program requiring remediation of hazardous waste released from permitted facilities. 50 Fed. Reg. 1515 (Jan. 11, 1985) (authorizing base program); 60 Fed. Reg. 53708 (Oct. 17, 1995) (authorizing Corrective Action program). Accordingly, the New Mexico Environment Department ("NMED") is responsible for issuing RCRA permits in New Mexico under the NMHWA and enforcing Corrective Action at permitted facilities. Since 1989, CAFB has used RCRA's "Corrective Action" cleanup program—rather than the Defense Environmental Restoration Program ("DERP") that the U.S. military uses to implement CERCLA—to address environmental contamination at RCRA-permitted sites. **Ex. 8** § 1.2 (September 2005 CAFB "Community Relations Plan"). This change from CERCLA to RCRA is the result of EPA policy addressing the overlap between DERP/CERCLA and the RCRA Corrective Action program. *See* Shean Aff. ¶¶ 33, 39; *see also id.*, Ex. E (EPA memorandum stating that "RCRA takes precedence").

In December 2018, NMED issued CAFB a renewed RCRA permit, requiring that the Base take Corrective Action in response to releases of hazardous waste—a term the permit expressly defines to include PFAS—which would be subject to NMED approval and oversight. *Id.*, Ex. A §§ 1.12, 3.1–3.2. Because it did not comment on or otherwise object to these provisions when the permit was issued, the Air Force agreed to be bound by them. *Id.* ¶ 24. As such, CAFB must implement Corrective Action at the many sites subject to its RCRA permit where PFAS contamination exists. *Id.* ¶ 27; *see also* **Ex. 9** ("Kottkamp Tr.") 65:19–67:11. Further, CAFB's RCRA permit also requires that the Base report and potentially take Corrective Action at sites

8

where releases of hazardous waste are discovered, even if the site is not currently included in the permit. Shean Aff., Ex. A §§ 3.2.1, 3.6. Nothing in CERCLA alters these RCRA-mandated obligations and New Mexico's attempt to enforce them does not "challenge" a CERCLA cleanup.

## ARGUMENT

I.    **This Court Has Subject-Matter Jurisdiction Over the Dairy Plaintiffs' State-Law Tort Claims Regardless of Whether the DFE Applies**

A.    <u>The Dairy Plaintiffs' Claims Each Allege Harm from Water Pollution and Are Therefore Subject to a Superseding Waiver of Immunity Under the CWA</u>

In their respective complaints, the Dairy Plaintiffs' claims each allege that PFAS contamination migrating from CAFB has harmed them by polluting the water supplies they use for drinking water and livestock watering. *See, e.g.*, Highland Dairy Compl. ¶¶ 107, 125, 145, 158 (alleging the Government's negligent or wrongful conduct caused Highland Dairy's "water supply" or "wells" to become contaminated with PFAS). Thus, for the reasons expounded in Plaintiffs' omnibus DFE opposition, the Dairy Plaintiffs' claims are subject to the Clean Water Act's waiver of immunity for "all . . . State . . . requirements . . . respecting the control and abatement of water pollution . . . ." Omnibus DFE Opp. at 12 (quoting 33 U.S.C. § 1323(a)).

As that brief explains, such an interpretation is consistent with the Fourth Circuit's interpretation of a nearly identical provision included in the Clean Air Act in *North Carolina ex rel. Cooper v. TVA*, 515 F.3d 344, 352 & n.8 (4th Cir. 2008). In that case, the Fourth Circuit relied on two Supreme Court decisions to interpret the provision's use of the term "requirements" as including state-law tort claims alleging harm from air pollution, for which governmental immunity is waived. Omnibus DFE Opp. at 15-16. And because § 1323(a) of the Clean Water Act was enacted more than 30 years *after* the statute providing for exceptions to the FTCA's waiver of immunity—including but not limited to the DFE—the immunity waiver enacted in § 1323(a) supersedes and displaces those exceptions. Omnibus DFE Opp. at 12-13 & note 10. For these and

other reasons discussed in Plaintiffs' omnibus DFE opposition, the Court has an independent basis under the Clean Water Act for exercising subject-matter jurisdiction over the Dairy Plaintiffs' state law tort claims.

    B.    <u>The Dairy Plaintiffs' Trespass Claims Are Subject to a Specialized Immunity Waiver Under the FTCA</u>

All of the Dairy Plaintiffs assert claims against the Government for common-law trespass, a tort for which a specialized waiver of immunity exists in the FTCA as originally enacted in 1946. Omnibus DFE Opp. at 18–20. Specifically, as interpreted in an unbroken line of appellate court precedent stretching back more than 70 years,[6] two sections of the FTCA—one implementing a waiver of the Government's immunity, 28 U.S.C. § 1346(b), and the other providing for exceptions to that waiver for intentional torts, 28 U.S.C. § 2680(h)—clearly establish Congress's intent in 1946 to categorically waive the Government's immunity on common-law trespass claims. *See* Omnibus DFE Opp. at 18–25. Because no immunity defense exists for trespass claims like the ones Dairy Plaintiffs assert here, the portion of the Government's site-specific motion seeking dismissal of those claims should be denied.

## II.    The DFE Does Not Apply to the Dairy Plaintiffs' FTCA Claims

    A.    <u>OI 32-11 Was a Mandatory Directive Prohibiting AFFF from Entering CAFB's Sanitary Sewer System</u>

In addressing the DFE, the Government attempts to paint OI 32-11 as an "aspirational" document that merely presented Base personnel with "several options from which to choose" when responding to "hangar discharges of AFFF." Gov't CAFB Br. at 7–8. According to the Government, several ancillary passages from OI 32-11 simply present a set of options to Base personnel for responding to AFFF releases. *Id.* In truth, the passages not only laid out the available

---

    [6] The Dairy Plaintiffs incorporate by reference the detailed discussion of this precedent that appears in Plaintiffs' Omnibus DFE Opposition. *See* Omnibus DFE Opp. at 20–25.

options but also instructed Base personnel about the option that needed to be used based on the release's location and other circumstances. For example, OI 32-11's "Decision Matrix" instructed Base personnel about when AFFF hangar releases needed to be discharged onto nearby ramps, when they needed to be kept out of storm drain inlets and the sanitary sewer system, and when storm drains needed to be blocked while pumping AFFF from floor trenches, all based on the particular hangar where the release occurred. 2002 OI 32-11 § 8. Further, by directing Base personnel to keep AFFF out of the sanitary sewer system in all circumstances, the matrix only reinforces the mandatory nature of that policy as established in OI 32-11.[7]

But the true flaw in the Government's DFE argument stems from its treatment of contrary evidence, which the Government simply ignores in its site-specific brief. For example, the Government fails to even mention the language in OI 32-11's "POLICY" section which requires that AFFF ***"must be kept out of"*** (2002 version) or ***"must not enter"*** (2014 version) CAFB's sanitary sewer system. 2002 OI 32-11 § 5(a); 2014 OI 32-11 § 5(a). This language alone proves the mandatory nature of OI 32-11's policy against allowing AFFF to enter the Base's sanitary sewer system. *See, e.g.*, *Anthony v. United States*, 632 F. Supp. 3d 1017, 1031 (D. Ariz. 2022) (finding it proper to consider whether language is "casted in suggestive (e.g. 'should') rather than

---

[7] The Government places great emphasis on the matrix's use of the phrase "mission permitting" in instructing Base personnel to keep AFFF out of CAFB's sanitary sewer system. But allowing the inclusion of this phrase alone to transform an otherwise mandatory directive into discretionary guidance subject to the DFE "runs the risk of defeating the central purpose of the [FTCA], which waives the Government's immunity from suit in sweeping language." *Sanders v. United States*, 937 F.3d 316, 327 (4th Cir. 2019). *See also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862 (2017) ("[N]ational-security concerns must not become a talisman used to ward off inconvenient claims— a label used to cover a multitude of sins."). Taken to its logical end, this argument would allow the U.S. military to categorically avoid inquiry into whether its directives are mandatory simply by adding this phrase when it issued them. This is precisely the kind of overly generous interpretation of the DFE this Court has rejected because it "would result in the exception swallowing the rule" *Reynolds v. United States*, 2015 U.S. Dist. LEXIS 184062, at *3 (D.S.C. Aug. 14, 2015) (Gergel, J.) (quotation marks and citation omitted).

mandatory (e.g. ('must') terms" when determining whether a directive is mandatory). Any remaining doubt vanishes completely, however, once that language is viewed in the context of AFI 33-360, another Air Force instruction addressing "the procedures and standards that govern management of standard publications throughout the Air Force." **Ex. 10** ("2002 AFI 33-360") at 1.

The version of AFI 33-360 in effect when CAFB adopted OI 32-11 distinguished between "two categories of Air Force publications, directive and nondirective." *Id.* at 20. Directive publications were defined as those "necessary to meet the requirements of law, safety, security, or the areas where common direction and standardization benefit the Air Force." *Id.* Most importantly, AFI 33-360 expressly mandated that "Air Force personnel must comply with these publications."[8] Consequently, by including "Operating Instructions" in the "directive publications" category, AFI 33-360 provides decisive evidence that OI 32-11 encompassed mandatory directives for which compliance was required. *Id.* at 20. Concluding otherwise would undermine the Air Force's stated purpose for creating the two categories of publications, which was to provide "a descriptive way to quickly determine whether compliance with a publication is mandatory or if it is informational."[9] *Id.* at 17. Thus, the mandatory nature of OI 32-11 is supported by not just the plain language of its policies but by CAFB's very decision to convey those policies in an Operating Instruction as opposed to another type of publication.

---

[8] AFI 33-360 defined "Nondirective Publications" as those that are "informational and suggest guidance you can modify to fit the circumstances," noting that compliance was "not mandatory" for such publications. 2002 AFI 33-360 at 20.

[9] AFI 33-360 is also the reason that only the 2014 version of OI 32-11 included a banner stating: "COMPLIANCE WITH THIS PUBLICATION IS MANDATORY." When OI 32-11 was first adopted, AFI 33-360 required the banner only for Instructions issued by the Secretary of the Air Force, but by February 2014 that requirement applied to *all* Directive Publications, including Operating Instructions like OI 32-11. *Compare* 2002 AFI 33-360 at 19–20, *with* **Ex. 11** ("2013 AFI 33-360") at 34–39.

12

The Government's reliance on John Rebman's deposition testimony is similarly afflicted by a failure to acknowledge contrary evidence—including conflicting testimony from Rebman himself in the same deposition. Gov't CAFB Br. at 8–9. Amongst the testimony the Government ignores are Rebman's concessions that: 1) the phrase "aspirational goal" appeared nowhere in OI 32-11, Rebman Tr. 235:6–14; 2) beginning in June 2000, there was "a *mandatory regulatory requirement* that AFFF not enter the sanitary system" that remained in effect until Rebman retired in 2017, *id.* 264:11–18 (emphasis added); 3) he was aware "some people weren't following written procedures" and saw OI 32-11 as a way to "formalize those procedures by having our commander . . . sign a document . . . that would *require* the fire department Operations Flight programs and construction elements *to abide by* a single concise operating instruction," *id.* 198:16–199:12 (emphasis added); and 4) CAFB personnel "within the Civil Engineer Squadron" were "*expected to comply* within [sic] an operating instruction signed by their commander." *Id.* 213:2–13 (emphasis added).

The Government similarly disregards testimony of CAFB's former fire inspector, Charles Robertson, who, as a former member of the Base's Fire Protection flight, was the only witness ever tasked with actually enforcing OI 32-11's policies. **Ex. 12** ("Robertson Tr.") 26:16–19, 87:11–22; 101:18–102:2. In his testimony, Robertson confirmed: (1) that OI 32-11 established a policy prohibiting AFFF releases from entering CAFB's sanitary sewer system; (2) that compliance with that policy was mandatory; and (3) that Base personnel subject to OI 32-11 did not have the discretion to decide whether or not AFFF releases could enter the sanitary sewer system. *Id.* 79:3–80:8, 80:12–81:9. Based on this and the other evidence discussed above, the Dairy Plaintiffs have shown that OI 32-11 was a mandatory directive that renders the DFE inapplicable to their claims.

        B.      <u>Violations of OI 32-11 Have Contributed to the Dairy Plaintiffs' Injuries</u>

Describing it as an "obvious problem," the Government argues the Dairy Plaintiffs have "failed to show" any violation of a directive that was both "in place at the time the conduct occurred" and "caused plaintiffs' injuries."[10] Gov't CAFB Br. at 11 n.4. The Government's first contention is simply incorrect, as multiple witnesses agreed AFFF releases entered CAFB's sanitary sewer system after the Base adopted OI 32-11.[11] *See* Rebman Tr. 227:9–228:5, 249:24–250:22, 258:1–259:11 (admitting AFFF releases in February 2003, January 2005, and September 2008 entered CAFB's sanitary sewer system); Robertson Tr. 94:9–96:12 (agreeing a January 2005 noncompliance report CAFB submitted to EPA established "at least one violation" of OI 32-11).

In support of its second contention, the Government claims that because the WWTP "did not treat for PFAS," the issue of whether a release was "properly sent to the WWTP" has no bearing here. Gov't CAFB Br. at 11 n.4. That argument assumes, however, that even when Base personnel fully complied with OI 32-11, AFFF hangar releases were ultimately discharged to the environment somewhere in and around CAFB. That is simply not true. As OI 32-11's "Decision Matrix" demonstrates, Base personnel were instructed—regardless of where the release occurred—to pump AFFF hangar releases onto nearby ramps, where they could be contained and later "disposed off base in an approved fashion." *See* **Ex. 13** (9/8/2008 email from Pat Burns to

---

[10] Whether this type of causal nexus is even required to circumvent the DFE is debatable. *See, e.g.*, *Priah v. United States*, 590 F. Supp. 2d 920, 928 (N.D. Ohio 2008) (holding "there is no proximate cause component in a discretionary function analysis under the FTCA"). But even assuming—as the Government has—that such a requirement exists, for the reasons discussed in the balance of this section, the evidence overwhelmingly establishes a causal nexus between CAFB's violations of OI 32-11 and the PFAS contamination that has caused the Dairy Plaintiffs' injuries.

[11] The Government's emphasis on receiving a notice from EPA concerning NPDES permit violations is misplaced, as OI 32-11 itself can serve as a mandatory directive for purposes of the DFE. *Sanders*, 937 F.3d at 329 (holding there "may be circumstances in which internal operating procedures go beyond mere guidance, removing any discretion from the task at hand and articulating a mandatory directive that must be followed at the risk of incurring liability").

John Rebman). Thus, far from what the Government has suggested, compliance with OI 32-11 meant the difference between discharging AFFF hangar releases into the unlined NPLO, where the AFFF's PFAS component could infiltrate the underlying soil, versus containing those releases so they could be properly disposed off base.[12]

Moreover, the Dairy Plaintiffs fail to see how AFFF discharged from the WWTP to the NPLO is not causally associated with their contamination since the Government itself: (1) has detected combined PFOS/PFOA levels in both the surface water of the NPLO and an aboveground storage tank that collected groundwater downgradient of the NPLO that exceed EPA's LHA level many times over[13]; and (2) has acknowledged that the NPLO's "southerly flow direction takes groundwater and associated PFAS off-Installation." **Ex. 14** § 5.0 (3/27/2023 "Critical Process Analysis" for "North Playa Lake Area"). Moreover, the Dairy Plaintiffs' expert, James Bearzi, explains in his affidavit that off-base migration of PFAS from the NPLO has directly contributed to the contamination of their wells and properties. Bearzi Aff. ¶¶ 39–55.  Thus, the Dairy Plaintiffs have established not only that violations of OI 32-11 occurred at CAFB, but that those violations directly contributed to the PFAS contamination causally associated with their injuries.

C.    The DFE Does Not Apply to the Government's Failure to Warn About Potential PFAS Contamination of the Dairy Plaintiffs' Properties and Water Supplier

In its brief, the Government argues the Dairy Plaintiffs' failure-to-warn claims are barred based on letters that CAFB sent in September 2018 advising of PFAS detections in their respective

---

[12] To the extent the Government is suggesting that controlled releases of AFFF to the WWTP were permissible after the adoption of OI 32-11, the evidence clearly shows otherwise. *See, e.g.*, **Ex. 15** (2/2/2009 email from John Rebman reinforcing the "need to keep foam out of the sanitary sewer system" because "[e]ven a little can affect the wastewater treatment plant"); **Ex. 16**("If foam/water gets into the trenches [in a hangar], the trenches must be pumped out onto the ramp. At all costs, AFFF/HX foam must be kept out of the sanitary sewer system.").

[13] Bearzi Aff., Ex. H at fig. 4.4 (reporting combined PFOA/PFOS level of **145.9 ppt** in groundwater from aboveground storage tank); Bearzi Aff., Ex. P § 3.6.2 (reporting combined PFOA/PFOS level of **1,230 ppt** in surface water from the NPLO).

water supplies. Gov't CAFB Br. at 10–11. This ignores earlier opportunities, however, where Base personnel could have—but failed to—disclose the risk of PFAS contamination the Dairies faced based on their proximity to CAFB.

As the Final Report from CAFB's Preliminary Assessment demonstrates, at a minimum, the Base knew enough in October 2015 to conclude the Dairies were at risk of PFAS contamination, including that: (1) the general groundwater flow from CAFB was in the direction of dairy farms located to southeast; (2) a groundwater pathway existed from the NPLO to some of those farms; and (3) that on multiple occasions, AFFF releases containing PFAS entered the Base's sanitary sewer system, passed through the WWTP untreated, and were discharged to the unlined NPLO. Bearzi Aff., Ex. B §§ 1.3.2, 3.4.2, App'x C. As Art Schaap details in his affidavit, however, Highland Dairy received two visits in 2017 where Base personnel inquired about testing the dairy's water but failed to disclose *any* of this information to Schaap or anyone else at Highland. Schaap Aff. ¶¶ 14–33. Considering the visits occurred almost two years after CAFB's Preliminary Assessment was complete, the DFE is inapplicable to Base personnel's conduct during those visits since, as courts in the Fourth Circuit have acknowledged, failing to warn of long-standing hazards is not susceptible to public policy considerations. *See Washington v. Dep't of the Navy*, 446 F. Supp. 3d 20, 28 (E.D.N.C. 2020) (finding there were "simply no policy considerations to balance or weigh" in connection with the defendant's "decades-long failure" to warn about contaminated water provided at Camp Lejeune); *Parrish v. United States*, 157 F. Supp. 3d 434, 447 (E.D.N.C. 2016) ("Where dangers are long standing, the policy justifications supporting the government's exercise of discretion in responding to a hazard dissipate, if not disappear altogether."). Accordingly, the DFE does not divest this Court of subject matter jurisdiction over the Dairy Plaintiffs' failure to warn claims and that portion of the Government's site-specific motion should

be denied.

**III.    New Mexico's Claims Enforce State Hazardous Waste Laws and Are Not a Challenge under § 113(h)**

Section 113(h) does not operate as a "get out of jail free" card for the Air Force. New Mexico's claims seek to enforce the NMHWA, which New Mexico has been authorized to administer and enforce in lieu of RCRA under 42 U.S.C. § 6926. *See also id.* at § 6926(d) (actions under state program have same force and effect as action taken by EPA). Neither CERCLA nor DERP excuse compliance with state hazardous waste laws. Further, because CERCLA was intended to work in conjunction with state hazardous laws, enforcement of such laws does not constitute a "challenge" under § 113(h).

A.       The Air Force Is Not Excused from Its RCRA Permit Obligations

Performing a cleanup under DERP does not excuse the Air Force from its RCRA Permit obligations at the Base. Under AFI 32-7020, the Air Force must "implement CERCLA responses that integrate or incorporate RCRA substantive requirements, thereby satisfying its RCRA obligations." **Ex. 17** ("AFI 32-7020") at 2859; *see also* **Ex. 18** at p. 5 (Air Force personnel stating that "this CERCLA action must integrate or incorporate applicable requirements under the hazardous waste permit"). Numerous EPA policies agree.[14] Thus, complying with the NMHWA and CAFB's RCRA Permit could not possibly interfere with the Air Force's response action, because doing so was already required by CERCLA and/or DERP. In fact, EPA has repeatedly advised the Air Force that its response actions at CAFB must integrate RCRA requirements. *E.g.* Shean Aff. Ex. D ("[S]ince this is a RCRA permitted Facility, [NMED] is the Lead Regulatory

---

[14] *See, e.g.,* EPA, *Coordination between RCRA & CERCLA* (Sept. 24, 1996), available at https://www.epa.gov/sites/default/files/2013-10/documents/rcracorraction-mem.pdf;       EPA, *Improving RCRA/CERCLA Coordination at Federal Facilities* (Dec. 21, 2005), available at https://www.epa.gov/sites/default/files/documents/oswerdir9272_0-22.pdf.

Agency for RCRA Corrective Action implementation/oversight, and their State-specific requirements will need to be met.").[15] Contrary to these directives, however, CAFB personnel openly admit that the Air Force is not complying with the Base's RCRA permit and has no intent to do so. Kottkamp Tr. 34:24–35:1 ("We're investigating and managing PFAS under CERCLA, not RCRA."); Gierke Tr. 109:18–20 ("I can't say that we follow the entire RCRA permit, because there is part of it that is undergoing litigation.").[16] More importantly, the Air Force has repeatedly failed to implement requirements for the cleanup under the NMHWA that are necessary to protect the health and environment of New Mexicans. Shean Aff. ¶¶ 40–51.

   B.    Enforcement of the NMHWA Does Not Constitute a Challenge

   None of the cases relied on by the Government address the problem the Court is faced with here: a conflict between the federal government and a RCRA-authorized state regarding hazardous waste remediation within that state.[17]  Several of the cases cited by the Government barred review of lawsuits brought by PRPs. *Razore v. Tulalip Tribes of Washington*, 66 F.3d 236, 238 (9th Cir.

---

   [15] Before the Air Force's unilateral decision to proceed under DERP, early stages of the PFAS investigation **were** performed in compliance with the NMHWA. **Ex. 20** (notifying NMED of historic discharges of PFAS under Cannon's RCRA permit); Kottkamp Tr. 118:1–19. The Air Force is also performing PFAS cleanups under similar RCRA permits at other sites. Malcolm McClendon, *Air Force begins field work to investigate PFAS at former Reese AFB*, AFIMSC Public Affairs (July 30, 2020), available at https://www.af.mil/News/Article-Display/Article/2295836/air-force-begins-field-work-to-investigate-pfas-at-former-reese-afb/. ("These investigations are . . . required by the [RCRA] Permit and Compliance Plan issued to the Air Force by the Texas Commission on Environmental Quality.").

   [16] Although the Government has challenged the permit's inclusion of PFAS in state and federal court, it has correctly acknowledged that **"the permit remains in effect during that suit."** Opp'n to Mtn. for Prelim. Inj. and Cross Mtn. to Dismiss, *New Mexico v. U.S.*, No. 2:20-cv-2115-RMG (filed Sept. 7, 2019) at 9 n.3 (emphasis added).

   [17] Actually, the conflict here appears to be one between a RCRA-authorized state and just the United States military; EPA has at every opportunity expressed its support of New Mexico's authority over the cleanup. *See, e.g.,* Shean Aff. Ex. K (letter from EPA lamenting that it could not join New Mexico's enforcement action but noting that "EPA's participation . . . is not required" because New Mexico is RCRA-authorized, and that "EPA supports New Mexico's role as a co-regulator" over PFAS contamination at Cannon).

1995); *R.E. Goodson Const. Co. v. Int'l Paper Co.*, 2005 WL 2614927 (D.S.C. Oct. 13, 2005). Others concerned suits brought by neighboring landowners or non-profit groups. *Anacostia Riverkeeper v. Washington Gas Light Co.*, 892 F. Supp. 2d 161 (D.D.C. 2012); *Cannon v. Gates*, 538 F.3d 1328 (10th Cir. 2008); *Broward Gardens Tenants Ass'n v. EPA*, 311 F.3d 1066 (11th Cir. 2002); *Reynolds v. Lujan*, 785 F. Supp. 152 (D.N.M. 1992). But the Government overlooks the only case addressing the unique issue of whether § 113(h) applies to preclude a RCRA-authorized state from enforcing state hazardous waste laws within its jurisdiction: *U.S. v. Colorado*, 990 F.2d 1565, 1569–70 (10th Cir. 1993).

A fuller discussion of *Colorado* appears in Plaintiffs' Omnibus 113(h) Opposition and is incorporated here by reference. Omnibus 113(h) Opp. at 39–43. Most crucially, the Tenth Circuit concluded that "enforcement actions under state hazardous waste laws . . . do not constitute 'challenges' to CERCLA response actions." *Colorado*, 990 F.2d at 1579.[18] The court based its decision on Congress' "intent that CERCLA should work ***in conjunction with*** other federal and state hazardous waste laws." *Id.* at 1576 (emphasis added). Specifically, the court relied on CERCLA's "savings provision" and "relationship to other laws" provision, which expressly preserve a state's authority to undertake such action. *Id.* (citing 42 U.S.C. §§ 9652(d) and 9614(a)); *see also* Omnibus 113(h) Opp. at 40–41.

New Mexico's case is on all fours with *Colorado*. One minor difference—that CAFB is

---

[18] While Plaintiffs recognize that Tenth Circuit law is not controlling of this Court's consideration of federal questions, in multidistrict litigation the federal law of the transferor court "merits close consideration." *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987). This should be even more true where, as here, the law of the transferor court has examined the precise issue before the Court.

not on the National Priorities List ("NPL")—actually strengthens New Mexico's case.[19] "State laws concerning removal and remedial action, including State laws regarding enforcement, shall apply to removal and remedial action at [federal facilities] . . . not included on the [NPL]." 42 U.S.C. § 9620(a)(4).[20] Indeed, even the district court whose judgment *Colorado* reversed held (previous to the site at-issue being listed on the NPL) that § 113(h) did not apply, relying on § 9620(a)(4). *Colorado*, 990 F.2d at 1572–73. Because § 9620 requires expedited cleanups for federal facilities listed on the NPL, 42 U.S.C. § 9620(e), federal facilities are therefore either listed on the NPL and subject to its requirement or are subject to state oversight.

This Court should follow *Colorado*. No other authority has so closely examined the relationship between RCRA and CERCLA, nor interpreted Section 113(h) in this special context. Additionally, cases decided after *Colorado* have noted the unique considerations at issue in the case: the fact that the claim was brought by a state. *E.g. El Paso Natural Gas Co. v. U.S.*, 750 F.3d 863, 882 (D.C. Cir. 2014); *Ark. Peace Ctr. v. Ark. Dept. of Pollution Control and Ecology*, 999 F.2d 1212, 1217–1218 (8th Cir. 1993). No CERCLA cleanup can ignore RCRA requirements, much less a cleanup being performed—without oversight—by the very party responsible for the contamination. *See* Omnibus 113(h) Opp. at 12–14. Likewise, the United States cannot use Section 113(h) as a shield against litigation of those RCRA obligations by a state because they do not "challenge" or interfere with a cleanup, but rather merely ensure that the cleanup is performed lawfully. *Colorado*, 990 F.2d at 1579.

---

[19] Indeed, Cannon is not on the NPL because it was "***Deferred to RCRA Subtitle C***." Shean Aff., Ex. J; *see also* 62 Fed. Reg. 62523 (Nov. 24, 1997) (describing EPA policy to defer from the NPL "sites with releases that can be addressed under RCRA Subtitle C corrective action authorities", and expanding the policy to federal facilities) (citing 42 U.S.C. § 9620).

[20] *See also* 42 U.S.C. § 9620(i) ("Nothing in this section shall affect or impair the obligation of any department, agency, or instrumentality of the United States to comply with any requirement of the Solid Waste Disposal Act (***including corrective action requirements***).") (emphasis added).

Dated: April 16, 2024

Respectfully submitted,

*/s/ Paul J. Napoli*

Paul J. Napoli
Napoli Shkolnik
1302 Avenida Ponce de León
Santurce, Puerto Rico 00907
P: (833) 271-4502
F: (646) 843-7603
pnapoli@nsprlaw.com

*Co-lead Counsel for Plaintiffs and*
*Counsel for the Dairy Plaintiffs*

Allan Kanner
Kanner & Whitely, L.L.C.
701 Camp Street
New Orleans, LA 70130
Tel.: 504-524-5777
a.kanner@kanner-law.com

*Counsel for Plaintiffs the State of New Mexico*
*and the New Mexico Environment Department*

Michael A London
Douglas and London PC
59 Maiden Lane
6th Floor
New York, NY 10038
P: (212)-566-7500
F: (212)-566-7501
mlondon@douglasandlondon.com

Scott Summy
Baron & Budd, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
P: (214)-521-3605
ssummy@baronbudd.com

21

Joseph F. Rice
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
P: (843) 216-9000
jrice@motleyrice.com

*Co-lead Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was electronically filed with this Court's CM/ECF on this 16th day of April, 2024, and was thus served electronically upon counsel of record.

*/s/Andrew Croner*
